### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **BARBARA ANN JONES,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Claimant**, | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:12-cv-3605-KOB** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| | ) | |
| **Defendant**. | ) | |

### MEMORANDUM OPINION

### I. INTRODUCTION

On June 1, 2009, the claimant applied for a period of disability and disability insurance benefits under Title II of the Social Security Act, alleging disability commencing on April 1, 2006. (R. 111-112). The Commissioner denied these claims initially on August 4, 2009. (R. 99-101).

The claimant timely filed a request for a hearing before an Administrative Law Judge, and the ALJ held the hearing on November 23, 2010.  (R. 39-64, 110). In an opinion dated April 13, 2011, the ALJ found that the claimant was ineligible for both a period of disability and disability insurance. (R. 25-34). The Appeals Council subsequently denied the claimant's request for review on August 17, 2012, and the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1-4).  As the claimant has exhausted his administrative remedies, this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

1

For the following reasons, the court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant raised the following issues on appeal:

(1) whether the ALJ gave proper weight to the opinion of Mr. Dale, a physician's assistant who treated the plaintiff;

(2) whether the ALJ had a duty to re-contact Mr. Dale;

(3) whether the ALJ had to obtain a medical source opinion for his RFC assessment of the claimant, and whether substantial evidence supports his RFC determination that she can perform sedentary work with limitations.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. But this court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, ... but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e, that would direct the determination

or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). Whether the Plaintiff meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart,* 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports the finding.

This court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court must look not only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take into account evidence that detracts from the evidence on which the ALJ relied. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months....

To make this determination the Commissioner employs a five-step, sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question,

> or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

Absent "good cause," an ALJ must give the medical opinion of a treating physician "substantial or considerable weight." *Crawford v. Comm'r*, 363 F.3d 1155, 1159 (11th Cir. 2004). For a statement to be a "medical opinion," it must come from an acceptable medical source, such as a physician or psychologist. *Lawton v. Comm'r*, 431 F. App'x 830, 833 (11th Cir. 2011).  A opinion of physician's assistant is not an acceptable medical source, and, thus, the ALJ is not required to give it special consideration or weight.  *Id.* at 833-34; *see* 20 C.F.R. § 404.1513.  An ALJ, however, may consider the opinion of a physician's assistant to show the severity of the claimant's impairment and how it affects her ability to work.  *See* 20 C.F.R. § 404.1513(d)(1).

Under the law at the time of the ALJ's decision in this case, for an ALJ to have a duty to re-contact, the person sought to be re-contacted must be a treating source; the treating source's opinion must be unclear on an issue reserved for the commissioner; and the ALJ must not be able to ascertain the basis for the opinion from the record. *See* SSR 96-5p.  A treating source is "your own physician, psychologist, or other acceptable medical source." 20 C.F.R. § 404.1502. An acceptable medical source does not include a physician's assistant.  *See* 20 C.F.R. § 404.1513(a)(1)-(5).  As of March 26, 2012, the law changed and  imposes no duty on the ALJ to re-contact but gives him the discretion to re-contact a "treating physician, psychologist, or other medical source."  *See* 20 C.F.R. § 404.1520b(c)(1).

Additionally, the ALJ has a basic obligation to develop a full and fair record. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).  Developing a full and fair record does not include requiring an ALJ to secure a medical source opinion regarding the claimant's Residual Functional

4

Capacity. *See* 20 C.F.R. § 404.1546(c).  "The failure to include [an RFC assessment from a medical source] at the State agency level does not render the ALJ's RFC assessment invalid." *Langley v. Astrue*, 777 F. Supp. 2d 1250, 1261 (N.D. Ala.2011); *see Green v. SSA*, F. App'x 915, 923-24 (11th Cir. 2007).  An ALJ's RFC determination is not a medical assessment, but is "based on all the relevant evidence in [the claimant's] case record."  20 C.F.R.  § 404.1545(a)(1).

An RFC assessment involves determining the claimant's ability to do work in spite of her impairments and in consideration of all relevant evidence. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, pull, etc. 20 C.F.R. §§ 404.1545(b), 416.945(b).  The law defines sedentary work as requiring extended periods of sitting; "lifting no more than 10 pounds;" occasional "lifting or carrying articles like docket files, ledgers, and small tools;" and occasional "walking and standing." 20 C.F.R. §§ 404.1567(a), 416.967(a). Social Security Rule 83-10 further defines "occasional" to describe up to one-third of the time. A sedentary worker should not walk or stand more than two hours in an eight-hour work day and should sit for approximately six hours of an eight-hour work day. *Kelley v. Apfel*, 185 F.3d 1211, 1213 n. 2 (11th Cir. 1999).

## V. FACTS

The claimant was forty-nine years old at the time of the administrative hearing, and has her GED and completed some college work. (R. 46, 155). The claimant has past work experience as a daycare worker, house cleaner, and fast food worker.  (R. 57).  She claims disability beginning April 1, 2006 because of diabetes mellitus, diabetic peripheral neuropathy, obesity, and chronic pain.

*Physical Limitations*

On June 20, 2006 the claimant sought treatment with Dr. William E. Wilcox at Eastern Medical Specialists for diabetes, hypertension, and obesity. She reported having no headaches, chest pains, or unusual dyspnea, and indicated to Dr. Wilcox that she remained physically active in her job as a house cleaner.  The claimant reported taking Lipitor, Gabapentin, Gilpizide, Metformin, and Lotrel.  Dr. Wilcox reported that the claimant was an obese female "who appears well" and that her neurologic system was grossly intact. (R. 187).

The claimant did not return to Dr. Wilcox until almost a year later for an annual review and reported that she continued her daily activities with no exertional pains.  She indicated that she remained on medication for diabetes, hypertension, and hyperlipidemia, but that her blood sugar readings had been good.  Again, Dr. Wilcox described the claimant as an "obese female who appears well," and indicated that she had "somewhat improved obesity" and "fair control of her diabetes." (R. 185-86).

Almost eight months later, the claimant returned to Dr. Wilcox on February 27, 2008, complaining about a wrist injury in November 2007, for which she had to wear a cast for six weeks. The claimant indicated to Dr. Wilcox that she continued to work cleaning houses despite her wrist injury and could not keep her physical therapy appointments because of her need "to continue working."  She reported no current problems with chest pains, but the medical notes indicate that she would see Dr. Reeder on June 7, 2008 to discuss chest pains.[1]  Dr. Wilcox also reported that the claimant had lost 17 pounds since 2006.  (R. 183-84).

Over a year later, on March 4, 2008, the claimant sought to establish care as a new patient

---

[1]  The record contains no evidence of this June 7, 2008 appointment.

with Dr. James Coffey and Benjamin Dale, a physician's assistant, at Jefferson Metrocare Healthcare Center.  The medical notes from this visit indicate that the claimant was taking the highest dosage of Neurontin with no side effects.  Also, the records indicate that the claimant had "no loss of protective sensation" in her feet from the neuropathy.  (R. 201-03).

The claimant returned to Mr. Dale and Dr. Coffey again on July 14, 2009 for a routine follow-up visit, indicating no significant changes in her condition since her last visit.  (R. 197-98).

On June 22, 2009, the claimant, with the assistance of interviewer A. Lee, with the Social Security Administration, completed a Disability Report—Adult—Form SSA 3368.  In her report, the claimant alleged that her ability to work is limited by neuropathic pain in her lower extremities, numb fingertips, and problems with balance; and that she has no side effects from taking Neurontin. The interviewer, in the remarks section of the report, indicated that "the claimant was very evasive in answering questions" and that the interviewer was unable to get a "straight to the point anser from her on any question."  The interviewer also reported that the claimant "seemed to be fishing and hunting for a correct answer" to give her.  The claimant indicated to the interviewer that she had not worked since 2006 "because her husband was employed at the plant with a good job," but that now her spouse was laid off and receiving unemployment compensation.  (R. 132-142).

On July 20, 2009, the claimant completed a "Function Report—Adult" at the request of the Social Security Administration.  The claimant reported that her activities of daily living include folding clothes; dusting furniture; cleaning bathrooms; loading dishwasher; washing and folding clothes; helping to prepare dinner if she did not have to stand too long; grocery shopping weekly at smaller stores for 15-20 minutes; attending church weekly; and taking a shower with husband helping her in and out of the bathtub because of her balance and no feeling in her feet. The claimant

7

indicated that she cannot vacuum, sweep, mop, or do outside chores.  She stated that she can walk one-half block before needing a break and needs a cane when her balance is bad.

On August 4, 2009, Maria Johnson, a State agency single decision maker, completed a Physical Residual Functional Capacity Assessment.  Ms. Johnson concluded in her assessment that the claimant had the following limitations: occasionally could lift and/or carry 20 pounds; frequently could lift and/or carry 10 pounds; could stand and/or walk a total of 6 hours in an 8-hour day; could sit with normal breaks about 6 hours in an 8-hour day; had no limits on ability to push/pull; occasionally could climb ramp/stairs, stoop, kneel, crouch, and crawl; never could climb a ladder/rope/scaffold; had limited hearing in right ear; and must avoid all hazards, including machinery and heights.  Ms. Johnson also indicated that the claimant's statements regarding the severity and limiting effects of her symptoms were only partially credible.

The claimant presented to the Emergency Department at Cooper Green Mercy Hospital on October 13, 2009 complaining of pain in her feet, describing the pain as "pricking" and "tingling" pain that goes up to her fingertips but is worse in her feet.  Dr. Khurram Bashir indicated her foot paresthesias was "worrisome for hereditary neuropathy"; prescribed Lidocaine patches and Elavil; and instructed that the claimant return in 3 months for a follow-up visit.  (R. 215).

On December 23, 2009[2], Mr. Dale referred the claimant to a pain clinic, indicating the claimant had no relief with Neurontin for diabetic neuropathy.  (R. 236).  However, the claimant did

---

[2] Although the ALJ indicates that Mr. Dale referred the claimant to a pain clinic in December 2009, this court notes that the date is unclear.  At first glance, the court thought the date written on the form was "10/23/09" but agrees that the "10" may be a "12."  In any event, the claimant did not immediately seek treatment at a pain clinic.

not established care with a pain clinic until February 22, 2010.[3]

On that date, Dr. John Shuster, with Cooper Green Hospital's Pain Clinic, examined the claimant, noting that the claimant's primary complaint was burning on the surfaces of her feet. The claimant reported that Neurontin helped initially, but that now she has good and bad days. She indicated that her balance was "getting bad" but reported no dizziness and that Loritab has been "really helpful." Dr. Shuster suggested the claimant have no caffeine; try Effexor; continue on a low dose of Loritab; and return for a follow-up appointment in 2-3 months. (R. 240).

On April 2, 2010, Mr. Dale, a physician's assistant, completed a "Physical Capacities Evaluation" at the request of the claimant's attorney. Mr. Dale reported that the claimant had the following limitations: could lift 5 pounds occasionally or less; could sit 6 hours and stand/walk 2 hours in an 8-hour work day; never could push, pull, climb, or balance; occasionally could bend, stoop, reach, and perform gross and fine manipulation; and could not work around hazardous machinery, dust, or fumes. (R. 241-42).

On the same day, Mr. Dale also completed a "Clinical Assessment of Pain" at the request of the claimant's attorney. In his assessment, Mr. Dale indicated that the claimant has pain, but it "does not prevent functioning in everyday activities"; that sitting, walking, standing, bending, stooping, or moving of extremities will increase greatly the claimant's pain "to such a degree as to cause distraction from tasks or total abandonment of tasks"; and that the claimant has some side effects from medication, "but not to such a degree as to create serious problems in most instances." (R. 243-44).

---

[3] The ALJ indicates in his decision that the claimant did not establish care with a Pain Clinic until April 2010. However, this court notes that the records indicate that the claimant sought care at the pain clinic initially on February 22, 2010.

On April 2, 2010, Mr. Dale also performed a "Clinical Assessment of Fatigue/Weakness." In the assessment, Mr. Dale indicated that the claimant has fatigue/weakness, but it "does not prevent functioning in everyday activities or work"; that sitting, walking, standing, bending, stooping, or moving of extremities will increase greatly the claimant's pain "to such a degree as to cause total abandonment of tasks"; and that the claimant does suffer some side effects from medications, but that those side effects do not create serious problems.  (R. 245-26).

On May 24, 2010, the claimant returned for a follow-up with Dr. Shuster at the Pain Clinic at Cooper Green Hospital. The claimant reported that her neuropathy in both of her lower extremities had been worse the past month since the loss of her mother and complained of increased burning, stabbing, and tingling pains in both her thighs and feet.  The claimant indicated that she takes 2400 mg of Neurontin that works best when also taking Lortab.

The claimant returned to the Pain Clinic at Cooper Green on August 17, 2010 for a three month follow-up appointment with Dr. Wilson and Kelly Watson, CRN.  The claimant indicated that the last increase in Lortab "has been very helpful to managing her neuropathy."  Dr. Wilson reported no new symptoms for the claimant and suggested they continue the medications as prescribed and return for a follow-up in four months.  (R. 251).

*The ALJ Hearing*

After the ALJ denied the claimant disability benefits, the claimant timely filed a request for a hearing, the ALJ held a hearing on November 23, 2010.  The claimant testified that she lives with her husband.   She indicated that she received her GED and has "some college" from Jeff State in Alabama and from a college in North Carolina.  As to past work experience, she stated that she worked at a daycare previously and at Merry Maids until April 2006.  (R. 45-47).

10

The claimant indicated that she cannot work because she can only stand on her feet 15-20 minutes at a time. She also claimed that she has pain in her legs and feet and that her pain is "intense."  On a scale of 1 to 10, with 10 being the worst pain, the claimant testified that her pain is a 6 ½ to 7.  She stated that she has to lie down all day long because of the intensity of her pain from her ankles up to her legs; that she has balance problems when walking around; that she can lift a gallon of tea with both hands; that she has to elevate her feet when she lies down because Mr. Dale told her to do so; and that she has swelling from time to time.  (R. 51-55).  She testified that the pain in her feet is worse than the pain in her hands.  (R. 62).

On a typical day, the claimant testified that she lies down for several times a day for 30-40 minutes each time, for a total of 1 ½ to 2 hours a day.  She claimed that she cannot work an 8-hour day job without having to lie down and raise her feet.  (R. 54-56).

Regarding her medications, she stated that she takes Hydrocodone for pain and six Gabapentin (or Neurontin) pills every four hours for her neuropathy.  (R. 55).

She indicated that she was involved in a car accident in October 2010, because the numbness in her foot interfered with her using the clutch, gas, and brake, causing her to run into a ravine.  (R. 51).

The vocational expert, Norma-Jill Jacobson, testified as to the claimant's past work as a daycare worker, a semi-skilled position, both at a light and medium exertion level; a house cleaner, an unskilled position, at a light exertion level; and a fast food worker, an unskilled position, at a light exertion level.  She testified that the claimant did not acquire any work skills that would transfer to other work.  (R. 56-58).

The ALJ then posed a hypothetical to Ms. Jacobson for an individual with the following

11

limitations: can lift objects up to 15 pounds; can sit for 6 out of 8 hours per day; can stand and walk for a cumulative total of 2 hours in an 8-hour day, with the ability to sit or stand to perform her job; and must avoid unprotected heights and hazards of moving machinery.  Ms. Jacobson testified that such an individual could not perform the claimant's past work, but could work in the following sedentary jobs: a general office clerical job, with 1,000 jobs in Alabama; a receptionist, with 1,200 jobs in Alabama; an order clerk and typist, with 1,000 jobs in Alabama; and a cashier, with 2,000 jobs in Alabama.  (R. 58).

Next, the ALJ posed a second hypothetical, including all of the limitations in the first one, but adding the following limitations: can only lift objects weighing up to 10 pounds.  Ms. Jacobson testified that the such an individual could perform all of the jobs listed in the first hypothetical.  (R. 59).

The ALJ then asked Ms. Jacobson to consider an individual with all of the limitations listed by Mr. Dale in Exhibit 7-F, discussed by the court in detail in this opinion, see *supra* pp. 9-10.  Ms. Jacobson reported that no jobs would exist for such an individual because the occasional use of hands for gross and fine manipulation wold eliminate any jobs.  (R. 59).

The ALJ asked Ms. Jacobson to assume that he found the claimant's testimony fully credible and supported by the record as a whole. Based on that assumption, Ms. Jacboson testified that the claimant would be unable to work based on her need to lie down and elevate her legs.

*The ALJ's Decision*

On April 13, 2011, the ALJ found that the claimant was not eligible for any of the disability benefits for which she applied.  The ALJ found that the under five-part analysis for

determining disable status, the claimant had met the insure status requirements of the Social

Security Act.  The ALJ further found that the claimant had not engaged in any substantial gainful

activity since the alleged onset date of April 1, 2006, because her earnings report showed no

work history or earnings after 2006. However, the ALJ did reference medical records after her

alleged onset date, from June 2006 to February 2008, where the claimant reported to medical

personnel that she remained active in her job as a house cleaner. The ALJ indicated that such

statements by the claimant were relevant in his evaluation of the claimant's credibility.  He also

referenced the Disability Determination Services interviewer's notes indicating that the claimant

was "very evasive" in answering questions, that she did not provide "straight to the point"

answers, and that she stated that she had not worked since 2006 because her husband "was

employed with a good job."  (R. 27-28).

   The ALJ found that the claimant has the severe impairments of diabetic peripheral

neuropathy and obesity, specifically indicating that he considered her obesity in accordance with

the law.  He also found that the claimant's hypertension and hyperlipidemia were non-severe

because the "objective medical evidence in the record indicates that these impairments are fairly

well-controlled" and because no evidence exists in the record to show that these impairments

substantially limit the claimant's function, either alone or in combination with her other

impairments.  (R. 28-29).

   Next, the ALJ stated that the claimant does not have an impairment or combination of

impairments that meets a Listing. He specifically evaluated the claimant's peripheral neuropathy

under Listing 11.14.  After finding no disability that meets a Listing, the ALJ stated that he

considered the entire record and found that the claimant has the RFC to perform sedentary work

13

with the following limitations: can lift no more than 10 pounds at a time; can sit for 6 hours of an 8-hour workday; can stand and/or walk for 2 hours of an 8-hour workday; must have a sit/stand option; cannot operate foot or leg controls; cannot work around unprotected heights; and should avoid hazards of moving machinery.  (R. 29).

In making his RFC finding, the ALJ stated that he considered all the claimant's symptoms and the extent to which those symptoms were consistent with the objective medical evidence. In applying the pain standard, the ALJ found that the claimant's condition might be reasonable expected to cause the alleged symptoms, but that the claimant's testimony regarding the level or intensity of those symptoms was not consistent with the evidence and assessment of her RFC as a whole.  (R. 30).

The ALJ then recounted the findings and evidence in the record to support his credibility determination of the claimant.  He discussed all the limitations the claimant testified prevented her from working.  The ALJ recounted the claimant's own statements regarding her activities of daily living, including doing most activities that do not require walking long distances or standing for long periods of time; taking care of her personal hygeine with no problems; preparing simple meals; performing many household chores; shopping; driving; going out alone; and going to church weekly.  Although the claimant testified that she had suffered from neuropathy for nine years, the ALJ noted that she indicated to Dr. Wilson in 2006 that she was "feeling well" and that she remained "physically active in her job as a house cleaner."  The ALJ also pointed to the fact that the claimant did not seek treatment with Dr. Wilson until almost a year later in June 2007 for an annual review; that the claimant did not return again until February 2008, almost eight months later; and that during the February 2008 visit, the claimant indicated

14

that she continued to work with an injured wrist and could not do the physical therapy because it interfered with her working.  (R. 30).

The ALJ also addressed and considered all of the medical evidence in the record from Dr. Coffey and Mr. Dale, a Physician's Assistant from March 2009 through April 2010.  The ALJ specifically referenced that during the March 2009 visit, the claimant reported taking the "maximum dosage" of Neurontin with no side effects and that an examination showed "no loss of sensation in her feet."  He noted that although Mr. Dale referred the claimant to a pain specialist in December 2009, she did not establish care with a pain specialist until several months later; that the claimant reported in August 2010 that an increase in her Lortab "had been very helpful in managing her neuropathy."  As such, the ALJ found that the evidence in the record did not support a disability onset date of April 2006 because she was "managing her neuropathy with medication and minimal (approximately yearly) medical intervention and was continuing to work at some level into 2008."  He also noted that the she did not seek treatment for pain management until December 2009 and concluded that all of these facts undermined the claimant's credibility. (R. 30-31).

The ALJ also specifically addressed Mr. Dale's April 2010 assessments.  Although the ALJ noted that as a physician's assistant, Mr. Dale is not an "acceptable medical source" under the Social Security Regulations, he indicated that he fully considered Mr. Dale's evaluations. The ALJ gave Mr. Dales's conclusions "little weight" to the extent that they were inconsistent with the RFC determination.  Specifically, the ALJ noted that, although Mr. Dale indicated that the claimant could lift no more than 5 pounds, the claimant herself testified that she could lift a

gallon of tea with both hands.[4]  The ALJ noted that he included several of Mr. Dale's limitations

in the RFC, including that she could sit for a total of 6 hours in an 8-hour workday; could

stand/walk for a total of 2 hours; could only occasionally bend or stoop; and could not use push/

pull movements or leg controls.  (R. 31-32).

The ALJ rejected Mr. Dale's conclusion that the claimant could only occasionally

perform gross or fine manipulation. The ALJ pointed to the evidence in the record that showed

the claimant primarily complained of neuropathy in her lower extremities, and at most

complained of some numbness in her fingertips. The ALJ concluded that the evidence in the

record did not support this limitation.  (R. 32).

The ALJ also rejected Mr. Dales's conclusion that she could never climb or balance as

the record as a whole did not support that conclusion.  He also found that Mr. Dale's conclusion

that the claimant could never work around dust, allergens, or fumes was wholly unsupported and

unsubstantiated by any evidence in the record.

In considering Mr. Dale's April 2010 Clinical Assessment of Pain, the ALJ noted that

Mr. Dale reported that the claimant's pain is present but does not prevent her from functioning in

everyday activities or work, all consistent with the ALJ's findings.  The ALJ pointed out that Mr.

Dale also reached a contradictory conclusion that physical activity would greatly increase the

claimant's fatigue to such a degree as to "cause total abandonment of tasks." The ALJ rejected

this contention because the evidence in the record did not support such a finding, given the

claimant's own statements regarding her activities of daily living.  (R. 32).

The ALJ considered the side effects of her medication, and noted that the claimant was

---

[4] A gallon of tea weighs 8.4 pounds, not including the container.

taking the maximum dosage of Neurontin with no side effects.  He indicated that, at most, the claimant stated that her medications made her tired.  (R. 32).

In assessing the record, the ALJ considered the August 2009 assessment by Ms. Johnson, a State agency single decision maker, and gave it little weight because she is not a medial professional.  However, the ALJ did note that Ms. Johnson reported that the claimant could perform light work with some minimal limitations.  (R. 32).

After explaining all the evidence to support his RFC finding of sedentary work with additional limitations, the ALJ found that, based on the testimony of the vocational expert, Ms. Jacobson, the claimant was unable to perform any of her past work.  However, the ALJ found that jobs exist in the national economy that the claimant can perform, including working as a general office clerical worker; receptionist; order clerk and typist; and cashier.  As such, the ALJ concluded that the claimant was not disabled under the Social Security Act.

## VI. DISCUSSION

*(1) The ALJ gave proper weight to the opinion of Mr. Dale, a physician's assistant.*

The claimant argues that the ALJ did not give "proper weight to the opinion provided by Dr. Dale, [claimant's] treating physician."  Because *Mr.* Dale is not a treating physician, but a physician's assistant, the court disagrees and finds that the ALJ gave Mr. Dale's conclusions proper weight.

An ALJ must give the *medical opinion* of a *treating physician* "substantial or considerable weight" absent good cause for not doing so.  *Crawford v. Comm'r*, 363 F.3d 1155, 1159 (11th Cir. 2004).  A "medical opinion" must be from an acceptable medical source, such as a physician or psychologist.  *Lawton v. Comm'r*, 431 F. App'x 830, 833 (11th Cir. 2011).

Because a physician's assistant's opinion is not an acceptable medical source, the ALJ is not required to give it special consideration or weight. *Id.* at 833-34; *see* 20 C.F.R. § 404.1513. An ALJ, however, *can* consider a physician's assistant's opinion to show the severity of the claimant's impairment and how it affects her ability to work. *See* 20 C.F.R. § 404.1513(d)(1).

Although the claimant refers to Mr. Dale as "Dr. Dale," Mr. Dale is a physician's assistant, not a doctor or treating physician. Because a physician's assistant is not an "acceptable medical source," the ALJ had no duty to give Mr. Dale's conclusions the great weight afforded to a treating physician. The ALJ properly stated the weight he did give Mr. Dale's conclusions and indicated specifically that he considered those conclusions in making his determinations. The ALJ went through each and every limitation espoused in all three of Mr. Dale's assessments and explained in detail how he included that limitation in his RFC or how the evidence in the record did not support such a limitation. The court notes that the ALJ adopted many of the limitations included in Mr. Dale's report in his RFC assessment, showing the ALJ's careful consideration of Mr. Dale's assessments, including only sitting for a total of 6 hours in an 8-hour workday; only standing/walking for a total of 2 hours in an 8-hour workday; only occasionally bending or stooping; and never using push/pull movements or leg controls.

This court finds that the ALJ applied the proper legal standard in assessing Mr. Dale's conclusions and that substantial evidence supports the ALJ's findings.

*(2) The ALJ had no duty to re-contact Mr. Dale.*

The claimant alleges that the ALJ erred by failing to re-contact Mr. Dale. The court disagrees and finds that the ALJ had no duty to re-contact Mr. Dale.

Under the law at time of the ALJ's decision in this case, an ALJ had a duty to re-contact a

18

treating source if the opinion is unclear on an issue reserved for the commissioner, and the ALJ cannot ascertain the basis for the opinion from the record. *See* SSR 96-5p.  The law defines a treating source as "your own physician, psychologist, or other acceptable medical source." 20 C.F.R. § 404.1502. A physician's assistant is *not* an "acceptable medical source."  *See* 20 C.F.R. § 404.1513(a)(1)-(5).  So, the ALJ did not have a duty to re-contact a physician's assistant. Morever, as of March 26, 2012, the law imposes no duty on the ALJ to re-contact but gives him the discretion to re-contact a "treating physician, psychologist, or other medical source."  *See* 20 C.F.R. § 404.1520b(c)(1).

Because Mr. Dale is a physician's assistant and not considered a "treating source," the ALJ had no duty, under the law as it stood in 2011, to re-contact Mr. Dale.  Even under the current law, the ALJ in this case would have discretion, not a duty, to re-contact a medical source.  See 20 C.R.R. § 404.1520b(c)(1).

After thoroughly reviewing Mr. Dale's assessments and the entire record in this case, this court finds that, even if the court were to consider Mr. Dale a "treating source," the ALJ had substantial evidence in the record to form a basis for his ultimate decision and did not need to re-contact Mr. Dale on any issue.  Mr. Dale's assessments were not "unclear," and the ALJ took great lengths to include some of Mr. Dale's limitations in his RFC finding and thoroughly explain those limitations not supported by the evidence in the record.  The ALJ applied the proper legal standard in deciding to not re-contact Mr. Dale, and substantial evidence supports his decision.

*(3) The ALJ did not have to obtain a medical source opinion for his RFC assessment of the claimant, and substantial evidence supports his RFC determination that she can perform*

19

*sedentary work with limitations.*

The claimant argues that the law requires that, for an ALJ to fully develop the record, he must base his RFC determination on a physician's opinion. This court finds that the ALJ had no such duty. The ALJ has a basic duty to develop a full and fair record. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). However, such a duty to develop the record does not require an ALJ to obtain a medical source opinion regarding the claimant's RFC assessment. *See* 20 C.F.R. § 404.1546(c). "The failure to include [an RFC assessment from a medical source] at the State agency level does not render the ALJ's RFC assessment invalid." *Langley v. Astrue*, 777 F. Supp. 2d 1250, 1261 (N.D. Ala.2011). An ALJ's RFC determination is not a medical assessment, but is "based on all the relevant evidence in [the claimant's] case record." 20 C.F.R. § 404.1545(a)(1).

An RFC assessment involves determining the claimant's ability to do work in spite of her impairments and in consideration of all relevant evidence. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). In the present case, the ALJ properly based his RFC determination that the claimant could perform sedentary work with additional limitations on all of the relevant and credible evidence in the record, including the claimant's statements and testimony of what she can do and all of the objective medical evidence. The law did not require the ALJ to obtain a separate medical opinion from a physician upon which to base his RFC determination.

As the Commissioner correctly noted in her brief, "[r]equiring an ALJ's RFC finding to be based on a physician's opinion 'would, in effect, confer upon the [physician] the authority to make the determination or decision about whether an individual is under a disability, and thus

would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'" (Comm'r Br. at 12-13) (citing SSR 96-5p).  Such abdication is not the law.

This court finds that substantial evidence supports the ALJ's RFC assessment that the claimant can perform sedentary work with limitations.  In making his credibility determination regarding the claimant's allegations of her limitations, the ALJ noted that after her alleged onset date of disability of April 2006, the claimant reported to doctors that she continued to work as a house cleaner at least through 2008, but reported no income from that time.  He also considered the claimant's own statements of her daily activities in determining that she can perform sedentary work with limitations, including the facts that she can do most activities that do not require walking long distances or standing for long periods of time; can prepare simple meals; can perform many household chores; can shop; can drive; and goes to church weekly.  The ALJ properly took all of the claimant's own admissions about what she can do in determining her RFC to do sedentary work.  Also, the ALJ properly based his RFC assessment that the claimant could lift more than 5 pounds on her own testimony that she can lift a gallon of tea with both hands. He also took into account all of the medical records from her visits with Dr. Wilson, Dr. Coffey, and Mr. Dale, noting that the records showed that the claimant was managing her neuropathy well with medication and minimal medical intervention.  He also indicated that the claimant did not seek treatment for pain management until December 2009, and seemed to manage her pain well with medications after that point.

After reviewing the entire record in this case, this court finds that the ALJ applied the proper legal standards in determining the claimant's RFC and that substantial evidence supports

his finding that the claimant can perform sedentary work with limitations.

**VII. CONCLUSION**

For the reasons stated, this court finds that the decision of tte Commissioner of Social Security denying disability benefits to the claimant is due to be AFFIRMED.

The court will enter a separate Order to that effect simultaneously with this Memorandum Opinion.

DONE and ORDERED this 14th day of March, 2014.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE